**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Julio WASSERTEIL, Hector Camacho
and Menachem Friedman,
Defendant-Appellants.**

**Nos. 80–1160, 80–1161 and 80–1162.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 9, 1980.
Decided March 13, 1981.

Rehearing and Rehearing En Banc
Denied May 22, 1981.

Howard B. Frank, Frank & Milchen, San Diego, Cal., for Wasserteil.

Nelson P. Brav, Brav & Schwartz, San Diego, Cal., for Friedman.

Richard E. L. Strauss, San Diego, Cal., for Camacho.

Herbert B. Hoffman, Asst. U. S. Atty., San Diego, Cal., for plaintiff-appellee.

Before FARRIS and NELSON, Circuit Judges, and CURTIS *, District Judge.

NELSON, Circuit Judge:

Julio Wasserteil, Hector Camacho and Menachem Friedman appeal from their criminal convictions on three count indict-

* The Honorable Jesse W. Curtis, Senior United States District Judge, Central District of Cali-   fornia, sitting by designation.

ments, one count of conspiracy to smuggle merchandise, 18 U.S.C. §§ 371, 545 and two counts of smuggling merchandise, 18 U.S.C. § 545.

We affirm.

## I. *Factual Background*

On October 16, 1977, United States Customs Agent Steven Dodge was assigned to a watch movement smuggling investigation. This assignment was pursuant to a phone call from the New York customs office stating that a reliable informant had given them information that Friedman was en route to Los Angeles from New York to pick up smuggled watch movements. The file supplied by the New York office contained previous reports from the informant identifying Wasserteil as a partner in a smuggling operation with Friedman.

Based on the informant's information, New York agents observed Friedman board a flight from New York to Los Angeles. When Friedman arrived in Los Angeles, he was observed proceeding to the Beverly Laurel Hotel, which was apparently full, so he went to the nearby Crest Motel. The next morning, Friedman walked back to the Beverly Laurel where he was picked up by Wasserteil in a car registered to Camacho. They returned to and entered the Crest Motel carrying with them two red suitcases. Wasserteil soon left with the suitcases, drove to a nearby drug store, picked up Camacho and Wasserteil's wife there and left the area.

Friedman left the Crest Motel later that morning, after making one trip to the dumpster in the alley behind the motel. Agents later found there three United Airlines baggage claim tickets and brown watch movement wrappings with Swiss names and various stamps.

When Friedman arrived at the T.W.A. terminal at Los Angeles International Airport, Dodge observed him attempting to purchase a ticket to New York. Dodge then approached Friedman, identified himself, and told Friedman he wished to speak with him, although he was not under arrest. He was, however, being detained. Dodge asked Friedman to accompany him to the

Customs office in another part of the terminal. Dodge, Friedman and two other Customs agents proceeded to the Customs office. (En route, they passed through an airport security area. While security personnel wanted to search the luggage due to the results of the x-ray scan, Dodge identified himself and persuaded them not to.)

Inside the office, Dodge gave Friedman his *Miranda* warnings and told him that he (Dodge) believed the luggage contained smuggled watch movements. Friedman acknowledged that they did contain watch movements but said that he'd been assured by the seller that they were in the country legally. Dodge then asked from whom he'd purchased the movements. Friedman replied that he did not want to make further statements. The questioning period lasted about ten minutes.

Dodge then called the U.S. Attorney in Los Angeles to attempt to get a search warrant. The U.S. Attorney told Dodge she would have to call him back, which she did approximately an hour later. At that time, about 3:30 P.M., Dodge told Friedman he was free to go but that the baggage would have to remain pending application for a search warrant. Dodge then asked Friedman to sign a consent to search form, thereby saving the approximately five hours necessary to get a search warrant. Friedman signed the consent form, the watch movements were removed from the suitcases and Friedman departed.

The subsequent search revealed 6,008 watch movements marked Nastrix Corporation (subject of count 3) and 1060 movements marked J. P. Pingouin, (subject of count 2).

At trial the prosecution presented evidence that the Pingouin watches had been purchased by Friedman in Switzerland, shipped to New York "in bond" and then returned to Switzerland without being entered or having duty paid. The prosecution's theory, supported by circumstantial evidence, was that Wasserteil, who was staying in Milan, Italy at a hotel close to the Swiss border, shipped two suitcases con-

taining the watch movements "in bond" to Hutchinson Brokers in California. The suitcases, labeled "personal effects," were reshipped to Tijuana by Camacho, Hutchinson's export clerk.

## II. *Motion to Suppress the Evidence*

### A. *Consent*

Appellants first contend that the district court erred in refusing to suppress the evidence discovered from the search of Friedman's suitcase because Friedman's consent to the search was involuntary and coerced.

■ At the outset, we note that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). Such a finding by a trial judge should be reversed "only if in viewing the evidence in the light most favorable to the government, [citation omitted], [this court] conclude[s] that it is clearly erroneous." *United States v. O'Looney*, 544 F.2d 385, 388 (9th Cir.), *cert. denied*, 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976). *See also United States v. Lemon*, 550 F.2d 467, 472 (9th Cir. 1977); *United States v. Tolias*, 548 F.2d 277, 278 (9th Cir. 1977).

■ This case is similar to *United States v. O'Looney*, 544 F.2d 385 (9th Cir. 1976), *cert. denied*, 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976), where we upheld the district court's finding that the defendant voluntarily consented to a search following a brief detention and questioning. Like the defendant in *O'Looney*, Friedman is a sophisticated businessman who was not subjected to prolonged interrogation or physical punishment. At no time was Friedman handcuffed or formally arrested. Moreover, Friedman, unlike the defendant in *O'Looney*, was informed of his right to refuse consent and leave prior to the signing of the consent form. Further, the consent form signed by Friedman informed him of the rights he was waiving by his consent, and in so doing made disclosures beyond those required under *Bustamonte*.[1] Hence, viewing the evidence in the light most favorable to the government, we find no error in the district court's determination.[2]

### B. *Detention*

Appellants also argue that the evidence should be suppressed as the fruit of an unlawful detention, citing *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1978).[3] This court discussed the impact of *Dunaway* in *Chamberlin v. United States*, 644 F.2d 1262 (9th Cir. 1980), noting that although very brief stops based on reasonable suspicion were authorized by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny, "the longer detentions must be justified by the traditional requirement of probable cause." *Id.*, at 1266. We concluded that a twenty

---

1. The consent form provided in part as follows:

    I, Manny Friedman having been informed of my constitutional rights as follows: first, that I may require that a search warrant be obtained prior to any search being made; second, that I may refuse to consent to any search; third, that anything which may be found as a result of this search can and will be seized and used against me in a criminal prosecution; fourth that I may revoke my consent to search at any time; and fifth, that I may consult with anyone of my choosing before I make a decision to waive my rights by consenting to this search,
    . . . .
    This written promise is given by me voluntarily and without threats or promises of any kind being made to me.

2. Appellants also attempt to rely on *Cipres v. United States*, 343 F.2d 95 (9th Cir. 1965), *cert. denied*, 385 U.S. 826, 87 S.Ct. 58, 17 L.Ed.2d 62 (1966). Among other distinctions, it must be noted that *Cipres* was a case decided under the Ninth Circuit doctrine, discredited in *Bustamonte*, that held that consent was only effective when the person giving consent knew it could be withheld.

3. The trial judge found that defendant Friedman's consent was "not invalid as a 'fruit' of an illegal detention." Wasserteil's E.R. at 45. It is not absolutely clear whether this was a finding that the detention was lawful or that the consent was not fruit. Because the detention was lawful, the fruit issue need not be discussed.

minute detention for questioning and observation for which there was no probable cause was unlawful and violative of the defendant's fourth and fourteenth amendment rights. *See United States v. Perez-Esparza*, 609 F.2d 1284, 1287 (9th Cir. 1979) (Holding that a three hour detention by a Border Patrol agent while awaiting arrival of DEA agents constituted an unlawful detention.) The detention, which in this case was about ninety minutes in length, would thus seem to be lawful only if supported by probable cause.[4]

■ Under *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), an informant's tip must satisfy a two-prong test to supply probable cause:

[T]he tip must detail (1) facts which show the informer is credible or the information is reliable, and (2) underlying circumstances which verify the validity of the informer's conclusions.

*Perez-Esparza*, at 1287. *See United States v. Anderson*, 509 F.2d 724 (9th Cir. 1974).

■ The district court below conducted an *in camera* examination of Agent Zamosky, who dealt with the informant, to determine the credibility of the informant and his information. A review of the *in camera* testimony of Agent Zamosky shows that it provided an adequate basis (i. e. historical data on this informant) for the judge to have concluded that the informant was reliable. The subsequent events, including the meeting with Wasserteil, the wrappings discovered in the trash and the other events observed by the Customs Agents provided a

sufficient basis for the judge to have found the requisite corroboration. Under a clearly erroneous standard, those conclusions should not be disturbed. *Anderson*, 509 F.2d at 730. Thus the detention, supported by probable cause, was lawful.

■ Appellants next contend that, although this court has upheld the use of *in camera* hearing to test the basis for an informant's information, *United States v. McLaughlin*, 525 F.2d 517 (9th Cir. 1975), *cert. denied*, 427 U.S. 904, 96 S.Ct. 3190, 49 L.Ed.2d 1198 (1976); *United States v. Anderson*, 509 F.2d 724 (9th Cir. 1974), *cert. denied*, 420 U.S. 910, 95 S.Ct. 831, 42 L.Ed.2d 840 (1975), an open court hearing is required when the reliability of the informant, the first prong of *Aguilar-Spinelli*, is at issue. While this particular issue would seem to be one of first impression in this circuit, the rationale of *Anderson* is equally applicable. In that case, we noted that the extent of disclosure involved balancing the "public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro v. United States*, 353 U.S. 53, 62, 77 S.Ct. 623, 629, 1 L.Ed.2d 639 (1957).

In striking that balance the trial judge, in the exercise of his discretion, can conduct an *in camera* hearing to which defense counsel, but not the defendant is admitted. . . . If the trial judge is satisfied that an *in camera* hearing in which neither the defendant nor his attorney participates is adequate to explore the foundation of the informant's information, then no disclosure is necessary. The trial court's determination will be reversed

---

4. The Supreme Court's recent decision in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), upholding an airport search undertaken in a DEA office as lawful on a consent theory, does not undermine this conclusion. In *Mendenhall*, the Court dealt with a defendant who had "voluntarily consented to accompany the officers to the DEA office." *Id.* at 556, 100 S.Ct. at 1878. The defendant there "had not been placed under arrest *or otherwise detained*," *id.* at 548, 100 S.Ct. 1874 (emphasis added), when she agreed to go there. The facts in this case are significantly different. Dodge testified that at the

point of initial contact he "advised Mr. Friedman he was not under arrest, *but being detained*, and Mr. Friedman agreed to accompany me." *R.T.* at 54 (emphasis added). Agent Dodge further testified that, until 3:30, Friedman "was being held for questioning." *R.T.* at 58. This case thus falls squarely within the *Dunaway* conclusion that "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Dunaway*, 442 U.S. at 216, 99 S.Ct. at 2258.

only if it constitutes an abuse of discretion or constitutional error.

509 F.2d at 729–30.

The thrust of *Anderson*, then, is that the extent of disclosure is committed to the judge's discretion. There is no reason for that precept to be altered when applied to the informant reliability prong.[5]

### III. *Election of Counts*

■ Appellants next contend that the trial court erred in refusing to require the government to elect between, or consolidate, count two (covering the Pingouin movements) and count three (covering the Nastrix movements) because they are based upon the same acts and course of conduct. This contention lacks merit for two reasons.

Initially, the several counts involved different merchandise for which there were different factual circumstances, thereby allowing the jury to reach conceivably different conclusions on the various counts. *See Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

In addition, Appellants motion is one addressed to the discretion of the court, and is granted where prejudice would otherwise result. *United States v. Sue*, 586 F.2d 70, 71 (8th Cir. 1978). *See Fed.R.Crim.Proc.* 14. Here, it is difficult to conceive of serious prejudice that could accrue to the defendants by the charging of separate counts for the individual groups of watches. The trial judge made clear at the outset his intention not to allow multiple sentences on the two substantive charges. The psychological effect on the jury, *see* 586 F.2d at 71, of the allegedly "extra" charge, given these facts, was negligible, and does not render the trial judge's decision an abuse of discretion.

### IV. *Right to Remain Silent*

■ The Fifth Amendment right in this context is one that pertains to the defendant's right not to *testify* in person. " '[T]he test is whether the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify.' " *United States v. Polizzi*, 500 F.2d 856, 891 (9th Cir. 1974), *cert. denied, sub nom. Emprise Corp. v. United States*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975), *quoting Knowles v. United States*, 224 F.2d 168, 170 (10th Cir. 1955).

Consideration of the three comments to which Appellants' complaints are directed reveals that none meet this test. The first two comments occurred during the presentation of the prosecution's case-in-chief and were references to Mr. Friedman's failure to produce documents showing that the watches were properly imported at the time of the airport seizure or at any time subsequent. These were not references to a lack of trial testimony, and thus could not meet the *Knowles* test.

The third comment occurred during the prosecution's rebuttal argument:

How about the other evidence in this case that demonstrates that no duties were paid? How about the evidence of Mr. Friedman sending the watches back and forth from New York to Switzerland? How about the way this business was conducted? I asked all the defendants, invited them in my opening argument, to please explain to you how this legitimate business transaction worked in the hotel in Los Angeles, and the transportation of the suitcases.

Did you hear an explanation from them? I invited them to give you one....

*R.T.* at 668. While this argument could be interpreted as being directed at the defendants' lack of testimony, when considered within the context, it is unlikely that the jury drew such a conclusion. In the Prosecutor's closing argument, he asked the *defense* to explain the reasonableness of the transaction. The quoted argument was thus a reference to the lack of the requested explanation. As the Fifth Circuit has noted, "[a] comment on the failure of the *defense* as opposed to the *defendant* to

---

**5.** Indeed, this court has upheld even the refusal by a trial court to hold even an *in camera* hearing to test the existence and reliability of government informants. *United States v. Kim*, 577 F.2d 473 (9th Cir. 1978).

counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's Fifth Amendment privilege." *United States v. Dearden,* 546 F.2d 622, 625 (5th Cir.), *cert. denied, sub nom. Goldstein v. United States,* 432 U.S. 902, 98 S.Ct. 295, 54 L.Ed.2d 188 (1977). This argument was directed at the defense, and did not constitute an infringement on Appellants' Fifth Amendment rights.

### V. *Sufficiency of the Evidence*

 Appellants Friedman and Camacho each allege that their convictions were not supported by sufficient evidence.

Defendant Friedman basically argues that the lack of direct evidence of illegal importation renders his conviction erroneous. In considering such a contention, this court must view the evidence and inferences to be drawn from it in the light most favorable to the government. *United States v. Richardson,* 588 F.2d 1235 (9th Cir. 1978), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed. 636 (1979). In *Richardson,* this court faced a similar contention and concluded that "circumstantial evidence is sufficient to establish illegal importation". *Id.* at 1240. In this case as well, the circumstantial evidence presented, including the evidence that the watches were made in Switzerland, the suspicious movements by Friedman, and the lack of documentation to show legitimate importation were sufficient to support the jury's conclusion.

Appellant Camacho also contends that the prosecution's evidence fails to show that he had the requisite knowledge to be convicted of the crimes charged. Circumstantial evidence "is also sufficient to establish knowledge of illegal importation." *Id.* Again viewing the evidence in the light most favorable to the government, the evidence of Camacho's knowledge cannot be labeled insufficient. Because the jury could well have accepted the prosecution's smuggling theory, under which Camacho 1) received two suitcases containing the watch movements and reshipped them to Mexico, 2) received a phone call from Wasserteil in Mexico City while the suitcases were en route to him, and 3) permitted Wasserteil to use his suitcases and car during the transfer, this contention is without merit.

Affirmed.